UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SHARI A. WRIGHT, | ) | Case No.  5:14CV1609 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | Magistrate Judge George J. Limbert |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN[1], | ) | REPORT & RECOMMENDATION OF |
| COMMISSIONER OF | ) | MAGISTRATE JUDGE |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Shari A. Wright ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  ECF Dkt. #1.  Plaintiff asserts that the Administrative Law Judge ("ALJ") erred in her decision because she: (1) failed to evaluate the medical evidence and compare it to Section 1.00 of the Listing of Impairments; (2) failed to properly evaluate her fibromyalgia; (3) violated the treating physician rule; (4) failed to properly evaluate her credibility and the credibility of her former boss; and (5) posed an inaccurate hypothetical individual to the vocational expert ("VE").   ECF Dkt. #13.

For the following reasons, the undersigned recommends that the Court REVERSE the ALJ's decision and REMAND Plaintiff's case for reconsideration and proper analysis of Plaintiff's fibromyalgia and for proper application of the treating physician rule to Dr. Lohmeyer's opinion.

---

[1] On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

1

## I.      PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on March 10, 2011, alleging disability beginning April 1, 2008 due to osteoarthritis, fibromyalgia, depression, and anxiety.  ECF Dkt. #11 ("Tr.") at 204-219, 255.  The Social Security Administration ("SSA") denied Plaintiff's applications initially and upon reconsideration.  *Id.* at 148-176.  Plaintiff requested a hearing before an ALJ, which was held on January 25, 2013.  *Id.* at 36, 177-178.  Plaintiff, represented by counsel, testified at the hearing, as did a VE.  *Id.* at 36.

On April 18, 2013, the ALJ issued a decision finding that Plaintiff had not engaged in substantial gainful activity since April 1, 2008, the alleged onset date, and Plaintiff had mood disorder not otherwise specified, sick sinus syndrome, degenerative changes of the cervical and lumbar spine, and posttraumatic stress disorder ("PTSD") which were severe impairments under 20 C.F.R. §§ 404.1520(c) and 416.920(c).  Tr. at 22.  The ALJ then determined that Plaintiff did not have an impairment or combination of impairments that satisfied the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1526, 416.920(d), 416.925 and 416.926)("Listings").  *Id.* at 23.  She found that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) with the following limitations: she could stand/walk up to 6 hours per eight-hour workday, but could not stand more than 1 hour at a time before needing to sit or shift positions for 3-4 minutes while remaining on task; she could not work around heights, moving machinery or cordless tools; she could not climb ladders, ropes or scaffolds; she is limited to simple, routine tasks and low stress work (defined as work which would involve few workplace changes, with the changes introduced gradually, and the work would not involve a fast production rate pace or quotas); she would be off-task up to 5% of the workday; and she would likely

be absent one day per month due to her symptoms.  *Id.* at 24.  The ALJ determined that Plaintiff was unable to perform any past relevant work, but, considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that the Plaintiff could perform.  *Id.* at 27-29.  Based on the above findings, the ALJ determined that Plaintiff was not disabled under §§ 216(i) and 223(d) of the Social Security Act.

Plaintiff requested that the Appeals Council review the ALJ's decision, and the Appeals Council denied her request for review.  Tr. at 1-5.  The ALJ's decision therefore became the final decision of the Commissioner.  Plaintiff appealed the decision to this Court on July 22, 2014.  ECF Dkt. #1.  Plaintiff, through counsel, filed her brief on the merits on November 20, 2014.  ECF Dkt. #13.  Defendant filed a brief on the merits on December 22, 2014.  ECF Dkt. #14.  Plaintiff filed a reply brief on January 5, 2015.  ECF Dkt. #15.

## II.  SUMMARY OF MEDICAL EVIDENCE

On March 1, 2010, Plaintiff presented to Dr. Moreno for follow-up of her hip pain over the last six weeks.  Tr. at 442.  Examination showed tenderness over the trochanteric bursa, pain upon active range of motion with internal rotation of the left hip, and normal strength and gait.  *Id.*  Dr. Moreno diagnosed pelvis pain, tobacco use disorder, osteopenia and depression.  *Id.* at 443.  She prescribed pain medication, Nicorette gum, refilled Plaintiff's anti-depressant medication and ordered hip x-rays.  *Id.*  The x-rays showed normal bone density, no fracture, and no dislocation or soft tissue abnormalities.  *Id.* at 443, 448.

On June 18, 2010, Plaintiff presented to Dr. Moreno for, among other complaints, bilateral knee pain and stress after she kicked her daughter out of the house.  Tr. at 431.  Dr. Moreno noted that Plaintiff had no swelling or edema upon inspection of her knees, a normal range of motion without pain, no tenderness on the jointlines or collateral ligaments, and no crepitation of the patellofemoral

joint.  *Id*. at 432.  She diagnosed unspecified joint pain and prescribed Ultram.  *Id*.

On August 2, 2010, Plaintiff presented to Dr. Moreno complaining of panic attacks with no relief from Celexa and she also stated that Tramadol was not helping her osteoarthritis pain from her hips to her ankles.  Tr. at 428.  She told Dr. Moreno that she was using a cane.  *Id*.  She described her lower extremity pain as worse when getting out of bed and up from a chair and she indicated that it felt like the pain was a deep ache in all of her bones, mostly in her knees and hips.  *Id*.  Upon examination, Dr. Moreno found no edema in Plaintiff's knees or hips, but she had tenderness to her general anterior knee around the patella and over her trochanteric bursas in the hips/thighs.  *Id*. at 429.  Dr. Moreno diagnosed limb pain, mood disorder not otherwise specified, joint pain, and hip bursitis.  *Id*.  She prescribed an anti-inflammatory medication for Plaintiff's hip, referred her to physical therapy for her knee pain, and continued her anti-depressant medication.  *Id.* at 430.

On November 18, 2010, Plaintiff presented to Dr. Lookabaugh complaining of joint and back pain.  Tr. at 425.  She reported a history of hip and knee arthritis and explained that over the counter pain relievers were not helping.  *Id*.  Plaintiff indicated that she had not been to physical therapy because she had no insurance and she stated that she had edema in the left knee and morning stiffness that lasted all day.  *Id*.  She also complained of chest pain that began three nights prior followed by her throat feeling like it was on fire.  *Id*.  Upon examination, Dr. Lookabaugh noted positive epigastric pain to palpation, full range of motion in the knees, left knee with pain to palpation of joint line, no erythema or effusion and moderate crepitus bilaterally.  *Id*.  She diagnosed unspecified chest pain, melena, and unspecified joint pain.  *Id*.  She started Plaintiff on Prilosec and Vicodin, ordered x-rays of the knee, and told Plaintiff to stop taking NSAIDS.  *Id*.

On November 28, 2010, the x-rays of Plaintiff's left knee showed possible mild medial compartment joint space narrowing.  Tr. at 446.

On January 31, 2011, Plaintiff presented to Dr. Lookabaugh for bilateral ear pain and knee and leg pain. Tr. at 423. Plaintiff reported erythema and edema at the end of the each day and pain when she walked and descended stairs. *Id.* Upon examination, Dr. Lookabaugh found no effusion or erythema of the left knee, tenderness of palpation along the medial and lateral joint line, full range of motion without pain, and normal strength and sensation. *Id.* She assessed, among other diagnoses, osteoarthritis of the knee and leg and she gave Plaintiff a Kenalog and Lidocaine injection in the knee. *Id*. at 424.

On March 1, 2011, Plaintiff met with Dr. Lookabaugh's Nurse Practitioner ("NP") Darin Carman for follow-up of her fibromyalgia. Tr. at 421. Plaintiff noted persistent pain and indicated that she saw Dr. Pelligrino, a pain management specialist in Canton, Ohio who diagnosed her with fibromyalgia and prescribed Robaxin which she stopped taking because it did not help. *Id.* Plaintiff complained that she "hurt all over" and she had fallen at work because of the pain that she was experiencing. *Id*. She indicated that she had applied for disability and she had an upcoming appointment in physical therapy. *Id*. She reported that standing, climbing stairs and  and sitting aggravated her symptoms and a hot bath with epsom salts and going to sleep helped alleviate her symptoms. *Id.*

Upon examination, NP Carman noted that Plaintiff had generalized tenderness at multiple points along the length of her bilateral upper and lower extremities and had multiple tender trigger points in the same areas. Tr. at 421. He assessed fibromyalgia and joint pain at multiple sites and prescribed Amitriptyline and Elavil and ordered blood tests. *Id.* at 422.

On February 18, 2011, Plaintiff presented to Dr. Pelligrino, a physiatrist, for her complaints of widespread pain. Tr. at 462. Plaintiff explained that she had read about fibromyalgia and she felt that it fit the symptoms that she had experienced for the last five years. *Id.* She indicated that she was

laid off from her job for two months. *Id*. Upon examination and review of her history, Dr. Pelligrino found that Plaintiff did have fibromyalgia, most likely hereditary fibromyalgia. *Id*. He noted that she had pain in 18 of the 18 designated tender points for fibromyalgia and he prescribed physical therapy and Robaxin. *Id*. at 462, 506.

On March 7, 2011, Plaintiff presented to Dr. Lohmeyer, D.O. for her fibromyalgia. Tr. at 465. Dr. Lohmeyer's examination showed no edema in the extremities, clear lungs, no rash and no cyanosis. *Id*. She diagnosed osteoarthritis at multiple sites, fibromyalgia, osteopenia and tobacco use disorder. *Id*. She prescribed Cymbalta and Meloxicam and told Plaintiff to take calcium with magnesium and vitamin D. *Id*.

On March 23, 2011, Plaintiff presented to Dr. Pelligrino for her persistent hip and leg pain. Tr. at 461. Upon examination, he found normal gait and balance, and no joint swelling, effusion or heat. *Id*. He diagnosed fibromyalgia, osteoarthritis and osteoporosis. *Id*. He continued the Cymbalta that she was taking as she indicated that it was helping, and he added Vimovo and Vicodin. *Id*.

On March 29, 2011, Plaintiff presented to Dr. Lohmeyer complaining of anxiety and for follow up of her blood pressure. Tr. at 467. She explained that she had just gotten discharged from the hospital for her asthma and Dr. Pelligrino had started her on Vimovo, which was better than the Meloxicam. *Id*. She indicated that Cymbalta was working "great" as she was sleeping really well and feeling better. *Id*. She also stated that she was "very active." *Id*. Dr. Lohmeyer noted Plaintiff had no edema of her extremities upon examination, and she diagnosed fibromyalgia, tobacco use disorder, osteopenia and benign hypertension. *Id*.

On May 2, 2011, Plaintiff presented to Dr. Lohmeyer to discuss her work situation and to discuss the fact that she was unable to get Cymbalta as prescribed. Tr. at 516. Plaintiff explained that

she needed to work shorter hours at her job because she could not handle the lifting and grasping of objects.  *Id.*  She also indicated that she did well on Cymbalta, but her insurance did not cover the medication.  *Id.*  Dr. Lohmeyer diagnosed tobacco use disorder and peripheral neuropathy, gave Plaintiff a note, limiting her work to twenty hours per week, and ordered an EMG/nerve conduction study of Plaintiff's upper extremities.  *Id.*

On May 17, 2011, Plaintiff presented to the emergency room complaining of neck pain after she was involved in a car accident the day before.  Tr. at 473.  Physical examination showed mild to moderate pain in the posterior cervical spine and along the strap muscles.  *Id.*  She had equal grip strength and normal sensory and neurological examinations.  *Id.*  X-rays of the neck were obtained which showed degenerative joint disease and she was diagnosed with neck and cervical pain status post motor vehicle accident.  *Id.* at 473, 565.  Plaintiff was told to use the Vicodin and Naprosyn that she was already prescribed for her neck pain.  *Id.*

On May 20, 2011, Plaintiff presented to Dr. Gunning for her complaints of neck pain.  Tr. at 534.  He assessed cervical and lumbosacral strain/sprain and prescribed medications and gave her trigger point injections from May 2011 to September of 2011.  *Id.* at 528-534.  On September 9, 2011, Dr. Gunning reported that no headway was made for Plaintiff's pain relief and he was going to refill her Vicodin and Naproxen and refer her back to Dr. Pelligrino for pain management.  *Id.* at 528.

On May 31, 2011, Plaintiff presented to Dr. Lyall, Ph.D. for a psychological evaluation at the request of the agency.  Tr. at 482.  Plaintiff reported that she could not work anymore because of her fibromyalgia and chronic arthritis pain.  *Id.*  Plaintiff's family and medical history were reviewed with her and she stated that she was physically and sexually abused as a child.  *Id.*  She reported that she dropped out of high school two weeks before graduation as she had been kicked out of her mother's

-7-

home because of trouble she had with her mother's boyfriend. *Id.* at 483. She indicated that she was in special classes in school and she always had to re-read things, but she later earned her GED. *Id.* Plaintiff also related that she had between 20 and 25 jobs over the years and had been fired three times because of her mouth. *Id.* She also was currently working taking care of plants at Green Circle Growers, but she stated that she did not know if she could continue the work of twenty hours per week because it was too hard. *Id.* As to daily living activities, Plaintiff reported that she had no energy, had no friends, and her husband was upset with her because she did not take care of the house properly and she had no interest in doing so. *Id.*

Dr. Lyall found that Plaintiff was quite nervous and tense throughout the interview, she cried a number of times, and she spoke in a slightly rapid fashion with sometimes impulsive speech. Tr. at 484. He noted that Plaintiff had mild difficulty understanding complicated questions. *Id*. Dr. Lyall opined that Plaintiff's intellectual skills were in the borderline range. *Id.* He opined that Plaintiff may lack judgment based upon her emotional difficulties and possible Attention Deficit Hyperactivity Disorder ("ADHD") and she seemed to lack insight into her need to continue mental health treatment. *Id*. He diagnosed Plaintiff with chronic PTSD and assigned her a global assessment of functioning ("GAF") range at 55 for her symptom GAF and overall GAF, with a GAF of 60 for her functional GAF. *Id*. at 485.

As to a prognosis, Dr. Lyall indicated that Plaintiff may have learning difficulties as *w*ell as posttraumatic stress difficulties. Tr. at 485. He described her ability to understand, remember and carry out instructions as not difficult with simple instructions, but she may have upper borderline intellectual skills. *Id.* He opined that Plaintiff's ADHD-like symptoms limited her abilities to maintain attention and concentration, and her ability to respond appropriately to supervisors and co-

workers may be limited because she had been fired three times before for talking back to employers and she stated that she had no girlfriends.  *Id.* at 486.  He also found that Plaintiff's ability to respond appropriately to work pressures in a work setting were limited in that as pressure increased at work, Plaintiff could develop increased psychological and somatoform symptoms.  *Id.*

On June 17, 2011, Plaintiff presented to Dr. Lohmeyer for leg cramps and neck and back pain. Tr. at 513.  She indicated that she had applied for disability benefits as she was having a hard time at her physical job.  *Id.*  Dr. Lohmeyer assessed a limb cramp, tobacco use disorder and depression with anxiety, and started Plaintiff on Chantix to help her to stop smoking.  *Id.* at 514.

On June 22, 2011, Plaintiff presented to Dr. Pelligrino for evaluation for her fibromyalgia, which she described as stable and averaging an 8 of 10 on a pain scale, with the worst pain in her upper body.  Tr. at 502.  She believed that the Vimovo was helping and requested a refill.  *Id.*  She also indicated that she was involved in a car accident and was seeing a chiropractor and sports medicine doctor for that.  *Id.*  She also stated that her primary care doctor had refilled her Vicodin.  *Id.*  Dr. Pellingrino examined Plaintiff and found that she had a normal gait and balance and he refilled her Vimovo and deferred to the treatments of her other doctors at the moment for the fibromyalgia.  *Id.*

On August 22, 2011, Plaintiff presented to Dr. Lohmeyer for her depression and blood pressure.  Tr. at 512.  She indicated that she was seeing a counselor for PTSD and the counselor felt that she needed medication.  *Id.*  Plaintiff reported that she had anxiety with panic, she was crying uncontrollably, she was not sleeping or eating, and she had lost her job and car due to the car accident. *Id.*  She stated that Cymbalta did not work and Dr. Lohmeyer noted that her blood pressure was very high, which was unusual.  *Id.*  Upon examination, Dr. Lohmeyer found that Plaintiff had a down affect and was tearful, but she had good eye contact.  *Id.*  She assessed depression with anxiety and panic

-9-

disorder and started Plaintiff on Venlafxine ER and Lorazepam.  *Id.*

Plaintiff also treated with a chiropractor following her car accident and he ordered a lumbar MRI on October 6, 2011 which showed minimal disc bulges at multiple levels at T11-T12, L3-L4, L4-L5 and L5-S1, with retrolisthesis of L5 on S1.  Tr. at 537-558.

On December 12, 2011, Plaintiff underwent a psychiatric evaluation and was diagnosed with PTSD and mood disorder, not otherwise specified.  Tr. at 571.  Her GAF was rated at 45, indicative of serious symptoms.  *Id.*

On August 13, 2012, Plaintiff presented to Dr. Singh for complaints of syncope and bradycardia.  Tr. at 579.  She indicated that she had not been feeling well since 2006 when her heart rate dropped to 30 during surgery and she started feeling increased fatigue over the last year.  *Id.*  She reported that she saw Dr. Lohmeyer several months ago and her heart rate was in the 40s and she was having episodes of fatigue, weakness, syncope, and decreased exercise tolerance.  *Id.*  She explained that she treated with Dr. Lohmeyer a few days prior and her heart rate was again in the 30s so Dr. Lohmeyer sent her for admission to the hospital.  *Id.*  Plaintiff's physical examination was normal, but her EKG showed sinus bradycardia and her telemetry showed heart rates between 30 and 40 beats per minute.  *Id.* at 580.  She was diagnosed with symptomatic sick sinus syndrome with no reversible cause and Dr. Singh recommended a permanent single chamber pacemaker.  *Id.*

On August 31, 2012, Plaintiff presented to Certified Nurse Practitioner Croom-Simpson after she had the pacemaker implanted on August 15, 2012.  Tr. at 581-584, 601-604.  Plaintiff had reported a syncopal spell after the pacemaker implantation that occurred without warning.  *Id.* at 581.  The pacemaker was checked and it was found to be functioning normally.  *Id.* at 582.  CNP Croom-Simpson noted that Plaintiff may need to upgrade to a dual-chamber pacemaker.  *Id.*

-10-

On September 10, 2012, Plaintiff followed up with Dr. Lohmeyer for her pacemaker and blood pressure.  Tr. at 597.  Plaintiff reported that she felt much better after the implantation of the pacemaker.  *Id.*  She was diagnosed with a dental abscess for which her cardiologist had released her for dental surgery, tobacco use history, and anxiety.  *Id.* at 598.

On December 18, 2012, Plaintiff presented to Dr. Lohmeyer to discuss kidney stone surgery to occur in January of 2013.  Tr. at 588.  Plaintiff had indicated that she started smoking again and was very upset by that.  *Id.*  She was diagnosed with kidney stones, anxiety and tobacco use disorder, continued on Klonopin and Vicodin, and Chantix was restarted.  *Id.*

On January 18, 2013, Plaintiff presented to Dr. Lohmeyer complaining of swelling in her legs following kidney stone surgery a few days prior.  Tr. at 630.  She was diagnosed with edema and told to continue Meloxicam and stop Pyridium and to watch her salt intake.  *Id.*

On March 26, 2013, Dr. Lohmeyer completed a physical capacity assessment concerning Plaintiff.  Tr. at 639.  She listed Plaintiff's diagnoses as fibromyalgia, kidney stones and DDD of the cervical and lumbar spine.  *Id.*  She opined that Plaintiff's prognosis for fibromyalgia was fair, the prognosis for kidney stones was continuing and the prognosis for the DDD was poor.  *Id.*  She opined that Plaintiff could frequently and occasionally lift and carry objects less than ten pounds, and she could sit, stand/walk less than one hour per eight-hour workday.  *Id.*  She opined that Plaintiff's abilities to push/pull and to use her upper and lower extremities were limited and she questioned Plaintiff's ability to sustain an eight-hour workday forty hours per week over significant periods of time.  *Id.*  Dr. Lohmeyer also opined that Plaintiff could occasionally climb ramps and stairs, but could never climb ladders, ropes or scaffolds, and never balance, stoop, kneel, crouch or crawl.  *Id.*  She further opined that Plaintiff could occasionally reach in all

directions, including overhead, and could frequently perform gross and fine manipulations. *Id.* at 640. Dr. Lohmeyer also opined that Plaintiff should avoid all exposure to extreme cold, heat, wetness, humidity and hazards, and she should avoid moderate exposure to noise, vibration and fumes, odors, dusts and poor ventilation. *Id.* She further anticipated that Plaintiff could be absent from work more than three times per month due to her impairments and treatment and Plaintiff would need to change positions as needed from sitting to standing, and would need to lay down on and off throughout the day. *Id.* at 641.

### III.   SUMMARY OF TESTIMONY

On January 25, 2013, the ALJ held a hearing at which Plaintiff, represented by counsel, and a vocational expert ("VE") testified. Tr. at 37. Plaintiff reported that she was 44 at the time of hearing and she lives with her 13 year old daughter in the upstairs apartment of her mom's house. *Id*. at 43. She has another adult daughter who stops in to help her everyday. *Id*. at 60. She indicated that she had worked after her alleged onset date at Green Circle for a couple of years up to 2011 and only worked a couple of months in 2011 before they let her go. *Id.* at 42. She has a driver's license but has not had a car since her car accident. *Id.* at 44. She was not sure if she could drive even if she had a car because it was uncomfortable driving and getting in and out of the car. *Id.* Plaintiff testified that she was in special math and reading classes in high school and did not finish high school. *Id.* at 45.

Plaintiff identified her medications and testified that they make her dizzy and sleepy. Tr. at 52. She indicated that her past surgeries included gall bladder surgery, a hysterectomy, carpal tunnel release in both hands, stints in her kidney and bladder, and a pacemaker. *Id.* She has had injections in her knees, hips and shoulders, and has participated in physical therapy. *Id*. at 53. She

uses a cane that her doctor did not prescribe, but about which her doctor knew she used.  *Id.*  She had stopped smoking since she had the pacemaker implanted in August of 2012.  *Id*. at 54.

Plaintiff described her pain as starting at the base of her neck and pinching between her shoulder blades going down her back and across her hips, to her knees and into her ankles.  Tr. at 54.  The pain begins as soon as her feet hit the floor from bed in the morning and she uses a heating pad and blanket to help the pain subside.  *Id.*  at 55.  She rated her pain as 8-10 on a daily basis.  *Id*.  She went through a typical day for the ALJ, indicating that she gets her daughter up for school in the morning and sits until her daughter gets herself ready and makes her own breakfast.  *Id*. at 56.  She then goes with her mother to take her daughter to school, returns home and takes her medications and goes to sleep for two or three hours.  *Id.*  She testified that when she wakes up, the pain is lessened in her ankles and legs and she just feels it in her back.  *Id.*  She falls asleep three to four times per day.  *Id.* at 70.  She does not cook, but makes a sandwich, but her daughters do the laundry, wash the dishes and take out the trash.  *Id*. at 57.  She can take care of her hygiene, but had to call her daughter the other night to help get her out of the bathtub.  *Id.* at 58.  She has trouble sleeping at night as her mind runs continuously.  *Id.*  She has a computer and checks e-mails, but has no interest in being on it otherwise.  *Id.*  She likes scrapbooking and cross-stitching and takes care of a dog and cat.  *Id.* at 58-59.  She can dust and pick up around the house as long as she can take breaks, but her daughters vacuum.  *Id*. at 65.

Plaintiff discussed her past employment, most recently at Green Circle, and indicated that she started having more and more trouble working and had to sneak to take breaks because she did not want her employer to know how much pain she was feeling.  Tr. at 62.  She then got to the point where she could not even pull the flower trays off of the cart and she started calling off of work.  *Id*.  Her supervisor, Linda Deal, wrote a letter on her behalf that is contained within the record.  *Id*. at 63.

Plaintiff also discussed her heart condition, explaining that she began falling and passing out, and she went to Dr. Lohmeyer for a well visit and she sent Plaintiff to the hospital because of the results on a heart monitor.  Tr. at 66.  Plaintiff indicated that she was told that her heart completely shut down and she could have died in her sleep if she would not have gone to the hospital that night.  *Id*.  She recalled some incidents with the pacemaker, including nine times in October where her heart was being run solely by the pacemaker.  *Id*. at 68.

The ALJ then presented a hypothetical individual to the VE.  Tr. at 73.  For the first hypothetical individual, the ALJ asked that the VE assume an individual with the same age, education and work experience as Plaintiff, who could perform light work except she could not climb ropes, ladders, or scaffolds, could not work around moving machinery and cordless tools, could occasionally climb stairs and ramps, occasionally stoop, could not work around dust, fumes and temperature extremes, and was limited to simple, routine tasks and low stress work involving few work place changes that have to be introduced gradually and had no production rate pace or quotas.  *Id.*

The VE testified that such a hypothetical individual could perform Plaintiff's past work as a deli worker.  *Id*. at 74.  The VE further indicated that a number of jobs existed in the state and national economy that could be performed by such a person, including a sales attendant, ticket seller, or order caller.  *Id.* at 75.

The ALJ then posed a second hypothetical assuming the same limitations as in the first hypothetical, but in addition the hypothetical individual could not stand more than one hour at a time and would need to sit or shift positions for three to four minutes while remaining on task.  Tr. at 76.  The VE indicated that these additional characteristics would not have any impact on the ability to perform the jobs previously identified in response to the first hypothetical.  *Id.*

The VE then discussed an employer's tolerance for an employee being off task, testifying that an employer would accept an employee being off task no more than eight percent of the time and being off task ten percent of the time would impact the employee's ability to sustain employment.  Tr. at 76-77.  The VE also stated that an employer would accept an employee being absent from work no more than twice per month.  *Id.* at 77.  He also testified that if an employee needed a cane to ambulate, she would not be able to perform any of the light exertional level jobs, but could perform sedentary jobs such as order clerk and final assembler.  *Id.* at 79.

Plaintiff's counsel then questioned the VE, modifying the ALJ's hypothetical individuals and adding restrictions of a specific distance from a number of objects due to Plaintiff's pacemaker, such as arch welding equipment, generators, alternators, soldering guns, jigsaws, chainsaws, induction ovens, small engine devices like lawnmowers, leaf blowers and snow blowers, electronic motoring devices, electromagnetic radiation or interference, even including cell phones.  Tr. at 81.  The VE testified that such a person could not perform Plaintiff's past relevant work or any work.  *Id.*  Plaintiff's counsel then removed the pacemaker restrictions, but added additional breaks needed by the hypothetical individual during the workday, including one more morning break and one more afternoon break.  *Id.*  The VE testified that such a person could perform light unskilled jobs, but only with the accommodations of the employer.  *Id.* at 82.

## IV.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to DIB and SSI.  These steps are:

> 1.    An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (§§20 C.F.R.  404.1520(b) and 416.920(b) (1992));
>
> 2.    An individual who does not have a "severe impairment" will not be found to be "disabled" (§§20 C.F.R.  404.1520(c) and 416.920(c) (1992));

3.     If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see §§20 C.F.R. 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (§§20 C.F.R. 404.1520(d) and 416.920(d) (1992));

4.     If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (§§20 C.F.R. 404.1520(e) and 416.920(e) (1992));

5.     If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (§§20 C.F.R. 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering his or her age, education, past work experience and RFC. *See Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.     STANDARD OF REVIEW

This Court's review of the ALJ's decision is limited in scope by § 205 of the Social Security Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla of evidence, but less

-16-

than a preponderance.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).   It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion.  *Id.*; *Walters,* 127 F.3d at 532.  Substantiality is based upon the record taken as a whole.  *Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

## VI.    ANALYSIS

The undersigned takes Plaintiff's assertions of error out of order, addressing the claim of error concerning her fibromyalgia and violation of the treating physician rule first.

### A.    FIBROMYALGIA

Plaintiff asserts that the ALJ failed to properly evaluate her fibromyalgia pursuant to Social Security Ruling 12-12p and failed to consider the limiting effects of her fibromyalgia on her RFC.  ECF Dkt. #13 at16-18.  The undersigned recommends that the Court find merit to this assertion.

Fibromyalgia "is a medical condition marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.' "  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 244 n. 3 (6th Cir.2007) (quoting Stedman's Medical Dictionary for the Health Professions and Nursing at 541 (5th ed.2005)).  Diagnosing fibromyalgia involves "observation of the characteristic tenderness in certain focal points, recognition of hallmark symptoms, and 'systematic' elimination of other diagnoses." *Rogers*, 486 F.3d at 244 (quoting *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir.1988)). The Sixth Circuit has recognized that CT scans, X-rays, and minor abnormalities "are not highly relevant in diagnosing [fibromyalgia] or its severity."  *Id.*; see also *Preston*, 854 F.2d at 820. "[P]hysical examinations will usually yield normal results – a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion."  *Id.* at 818.  Accordingly, "[o]pinions that focus solely upon objective evidence are not particularly relevant" due to the "the unique evidentiary difficulties associated

with the diagnosis and treatment of fibromyalgia." *Rogers*, 486 F.3d at 245.

SSR 12-2p, effective on July 25, 2012, before the ALJ's decision in the instant case, provides guidelines for evaluating fibromyalgia in disability claims.  SSR 12-1p (2012).  The Ruling notes that when a person is seeking disability based upon fibromyalgia, "we must properly consider the person's symptoms when we decide whether the person has an MDI (medically determinable impairment)" of fibromyalgia. *Id.*  The Ruling goes on to state that just like any other claim for disability benefits, the agency "must ensure there is sufficient objective evidence to support a finding that the person's impairment(s) so limits the person's functional abilities that it precludes him or her from performing any substantial gainful activity." *Id.*

The Ruling discusses the general criteria that can establish that a person has a MDI of fibromyalgia, which includes evidence from an acceptable medical source who has reviewed the claimant's medical history and examined the claimant and provided treatment notes so that the agency can see if they are consistent with a fibromyalgia diagnosis.  SSR 12-2p.  The Ruling outlines the medically acceptable criteria for establishing fibromyalgia, one of which includes a history of widespread pain in all quadrants of the body, at least 11 of 18 tender points on any physical examination, and evidence that other disorders that could explain the cause or symptoms were excluded. *Id.*  The Ruling also indicates that information from nonmedical sources such as neighbors, family, and past employers can be helpful in evaluating the severity and functional effects of a claimant's fibromyalgia. *Id.*

SSR 12-2p further explains how fibromyalgia is evaluated at each step of the sequential evaluation process.  SSR 12-2p.  At Step Two, the Ruling directs that if a claimant has a MDI such as fibromyalgia that could reasonably be expected to produce the pain or symptoms that a claimant alleges, those symptoms should be considered in determining severity at this Step, as well as determining whether the pain or symptoms cause a limitation that has more than a minimal effect

-18-

on the ability to perform basic work activities.  *Id*.  At Step Three, the Ruling notes that while fibromyalgia is not a listed impairment, it should be determined whether it medically equals a listing, such as Listing 14.09D for inflammatory arthritis, or whether it combines with at least one other medically determinable impairment to medically equal a Listing.  *Id.*  At Steps Four and Five, the Ruling notes that while the usual vocational considerations apply, the widespread pain associated with fibromyalgia, such as fatigue, and other nonexertional physical or mental limitations due to fibromyalgia pain, may result in other limitations that prevent a claimant from performing a full range of work.  *Id.*

In the instant case, the ALJ did not find that Plaintiff's fibromyalgia was a severe impairment at Step Two.  Tr. at 22.  Defendant asserts that this was not reversible error because Plaintiff only received limited treatment for the condition and no credible evidence existed that fibromyalgia caused significant limitations.  ECF Dkt. #14 at 9-10.

While Defendant is correct that Plaintiff received limited treatment from Dr. Pellingrino for her fibromyalgia, he noted after her third appointment with him that he was deferring her treatments to her primary care physician, chiropractor and sports medicine doctor.  Tr. at 502.  Defendant's assumption that because Plaintiff never returned to Dr. Pelligrino that her fibromyalgia was not severe enough is incorrect however, because Plaintiff continued to treat for her fibromyalgia with Dr. Lohmeyer, who prescribed medications for her, and with Dr. Gunning, who performed trigger point injections and prescribed medications as well, and with Minas Floros, D.C., for chiropractic care.  *Id*. at 518-558.

Nevertheless, an ALJ's error in not finding an impairment to be severe at Step Two does not necessarily constitute reversible error if she finds at least one severe impairment and continues to proceed throughout the sequential evaluation and considers both severe and nonsevere impairments in the rest of her evaluation.  *Maziarz v. Sec'y of Health & Human Servs*., 837 F.2d

240, 244 (6th Cir. 1987).  "[W]hen an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe impairments at step two '[does] not constitute reversible error.' " *Fisk v. Astrue*, 253 F. App'x 580, 583 (6th Cir.2007) (quoting Maziarz, 837 F.2d at 244).

In this case, the ALJ did find that Plaintiff's mood disorder not otherwise specified, sick sinus syndrome, degenerative changes of the cervical and lumbar spine and PTSD were severe impairments.  Tr. at 22.  Thus, while she did not find Plaintiff's fibromyalgia to be a severe impairment, this would not constitute reversible error if she considered Plaintiff's fibromyalgia in the rest of the sequential evaluation.

However, the ALJ did not mention Plaintiff's fibromyalgia in any part of her decision. Further, while she mentions Dr. Lohmeyer's opinion which severely restricts Plaintiff's work-related abilities based upon fibromyalgia and other diagnoses, the ALJ does not mention fibromyalgia and attributes only "little weight" to her opinion.  *Id*. at 27.  Moreover, the ALJ gives more weight to the opinions of the agency reviewing physicians, who identified Plaintiff's physical impairments as "Other and Unspecified Arthropathies" despite the fibromyalgia diagnoses in the record, and who considered Plaintiff's physical impairments only under Listing 1.02 for major joint dysfunction, and found that she could perform limited light work with postural limitations.  *Id*. at 27, citing Tr. at 94-143.  As to these opinions, the ALJ gave them only "some weight" because she found that they failed to consider Plaintiff's conservative treatment and lack of compliance with treatment at times.  *Id*. at 27.  However, the undersigned notes that "more 'aggressive' treatment is not recommended for fibromyalgia patients." *Kalmbach v. Comm'r of Soc. Sec*., No. 09-2076, 409 Fed. App'x 852, 864, 2011 WL 63602 at **11 (6th Cir. Jan. 7, 2011), unpublished.  Plaintiff in this case participated in physical therapy, had chiropractic care and injections, and has been prescribed many pain medications.

-20-

Accordingly, because the ALJ did not address Plaintiff's fibromyalgia in her decision, the undersigned recommends that the Court remand the instant case so that the ALJ can do so since Plaintiff has been diagnosed with this condition and has a treating physician opinion that severely limits her ability to work based in part upon fibromyalgia.

**B.    TREATING PHYSICIAN RULE**

Plaintiff also asserts that the ALJ violated the treating physician rule as she failed to properly evaluate Dr. Lohmeyer's March 26, 2013 opinion which severely limited Plaintiff's abilities based upon her diagnoses of fibromyalgia, kidney stones and DDD. ECF Dkt. #13 at 21. The undersigned recommends that the Court find merit to this assertion.

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004). A presumption exists that the opinion of a treating physician is entitled to great deference. *Id.*; *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007). If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544. When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, she must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, she must provide "good reasons" for doing so.  SSR 96-2p.  The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*  This allows a claimant to understand how her case is determined, especially when she knows that her treating physician has deemed her disabled and she may therefore " 'be bewildered when told by an administrative bureaucracy that [s]he is not, unless some reason for the agency's decision is supplied.' " *Wilson,* 378 F.3d at 544 quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999).  Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Id.*  If an ALJ fails to explain why she rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243, citing *Wilson*, 378 F.3d at 544.

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Commissioner of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *8 (6th Cir. Apr.28, 2010). For example, where an ALJ failed to describe "the objective findings that were at issue or their inconsistency with the treating physician opinions," remand has been ordered. *Barrett v. Astrue*, No. 11-08-GWU, 2011 WL 6009645, at *6 (E.D.Ky. Dec.1, 2011).  The Sixth Circuit has held that an ALJ's failure to identify the reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Parks v. Social Sec. Admin.*, No. 09-6437, 2011 WL 867214, at *7 (6th

Cir. March 15, 2011) (quoting *Rogers*, 486 F.3d at 243 ).

Here, the ALJ acknowledged that Dr. Lohmeyer was Plaintiff's treating physician. Tr. at 27. She then attributed "little weight" to Dr. Lohmeyer's opinion and offered three reasons for doing so. *Id*. The undersigned recommends that the Court find that the reasons offered by the ALJ are not good reasons for attributing less than controlling weight to Dr. Lohmeyer's opinion.

The ALJ first explained that she attributed "little weight" to Dr. Lohmeyer's opinion because Dr. Lohmeyer does not specialize in orthopedic care. Tr. at 27. This is not a valid factor to consider in determining whether to attribute controlling weight to a treating physician's opinion. A physician's specialty is a factor to consider only after the ALJ determines that she is not attributing controlling weight to that opinion. *See* 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5) (listing specialization of physician as one of six factors to consider in deciding the weight to give to a medical opinion once the decision is made whether to give controlling weight to treating source's opinion); *see also Gayheart v. Comm'r of Soc. Sec*., 710 F.3d 365, 376 (6th Cir. 2013)(factors in 20 C.F.R. § 404.1527(c)which includes specialization of medical source) are considered only after the ALJ has determined not to give controlling weight to treating source opinion). Thus, this is not a valid reason for attributing less than controlling weight to Dr. Lohmeyer's opinion.

The ALJ's second reason for attributing less than controlling weight to Dr. Lohmeyer's opinion was because, according to the ALJ, Dr. Lohmeyer "admits that she did not perform any range of motion or muscle strength testing on the claimant." Tr. at 27. The ALJ fails to cite to any page in the record where she finds such information. Dr. Lohmeyer did check boxes on the physical capacities form which asked her in one sentence to describe any limitations of Plaintiff's range of motion and in another sentence to describe any muscle strength abnormalities. *Id*. at 641. Under each of these sentences, Dr. Lohmeyer checked the box stating "Range of motion

-23-

assessment not performed or no opinion" and checked the box stating "Muscle strength testing not performed or no opinion." *Id*.  First, the undersigned notes that some of Dr. Lohmeyer's treatment notes show that she did in fact perform range of motion assessments as her April 10, 2012 treatment note indicates that Plaintiff had decreased range of motion on the right and left sides of her neck and decreased grip strength bilaterally.  *Id*. at 620.  Dr. Lohmeyer's April 24, 2012 treatment note also indicated that Plaintiff's range of motion was unchanged from previous visits.  *Id*. at 616.  She also noted that Plaintiff had cervical spasms at that visit, as well as ropey muscles that were tender to the touch.  *Id.*

Second, even if she had performed range of motion examinations on Plaintiff, this does not lend support to the ALJ's determination of the weight to give to Dr. Lohmeyer's opinion as to her diagnosis of Plaintiff's fibromyalgia.  Tr. at 638.  Dr. Lohmeyer noted on her physical capacities form that the medical findings in support of her assessment included "history, symptoms, physical exam findings, x-ray findings, laboratory test findings, hospital and other physicians' records."  *Id*. at 641.  Dr. Pelligrino, a physiatrist, examined Plaintiff on February 18, 2011 and found that her history and examination were consistent with fibromyalgia syndrome.  *Id*. at 504.  He noted in his physical examination notes that Plaintiff had pain in 18 of the 18 designated tender points for fibromyalgia and she had normal spinal range of motion and strength.  *Id*. at 506.  Fibromyalgia patients "manifest normal muscle strength and neurological reaction and have a full range of motion." *Preston v. Sec'y of Health & Human Servs*., 854 F.2d 815, 818, 820 (6th Cir.1988).  Thus, while range of motion and strength testing may be factors in assessing Plaintiff's cervical and lumbar spine degenerative changes, they are not valid criteria for assessing fibromyalgia.  Thus, whether Dr. Lohmeyer performed such testing is not a valid reason for rejecting her opinion that was in part based upon Plaintiff's fibromyalgia.

The ALJ's final reason for attributing less than controlling weight to the opinion of Dr. Lohmeyer is also lacking.  The ALJ finds that Dr. Loymeyer's opinion is "not entirely consistent with her own examination findings."  Tr. at 27.  However, the ALJ does not identify said findings or explain how they are "not entirely consistent" with Dr. Lohmeyer's opinion.

The undersigned also notes that the ALJ pointed to the conservative care that Plaintiff used to manage her impairments, which is also not applicable to evaluating the severity and limitations associated with fibromyalgia.  While conservative treatment plans generally indicate that a claimant is not disabled, "more 'aggressive' treatment is not recommended for fibromyalgia patients." *Kalmbach v. Comm'r of Soc. Sec.*, No. 09-2076, 409 Fed. App'x 852, 864, 2011 WL 63602 at **11 (6th Cir. Jan. 7, 2011), unpublished; *Preston*, 854 F.2d at 820 (noting that the physician "has done all that can be medically done to diagnose [claimant's] fibrositis and to support his opinion of disability" because he "referred [claimant] to a neurologist, orthopaedist, rheumatologist, and a psychologist" and recommended "physical therapy and a pain clinic for treatment").  Plaintiff in this case was referred to physical therapy, had chiropractic care and injections and has been prescribed many different pain medications.  She saw a physiatrist, who treated her three times and deferred to her primary care physician, and she saw a chiropractor and sports medicine doctor for continuing her fibromyalgia treatment.  She also saw a psychologist and counselor.

Of course, there are instances where an ALJ's failure to comport with the treating source doctrine may be deemed harmless. A violation of the rule might constitute "harmless error" where (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it"; (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or (3) "the Commissioner has met the goal of §1527(d)(2) – the provision of the procedural safeguard of reasons – even though [ ]he has not complied with the

-25-

terms of the regulation." *Wilson*, 378 F.3d at 547. None of these exceptions apply here. Neither the ALJ nor the Commissioner claim that the treating physician's findings were patently deficient, the ALJ did not adopt many of Dr. Lohmeyer's findings, and the ALJ did not meet the goal of the regulation in her decision.

For these reasons, the undersigned recommends that the Court remand this case in order for the ALJ to reassess Dr. Lohmeyer's opinion and, if rejected, offer a proper basis for the weight assigned to her opinion. Accordingly, the undersigned recommends that the Court reverse the decision of the ALJ and remand this case for further analysis under the treating physician rule.

### C. PLAINTIFF'S REMAINING CLAIMS OF ERROR

Plaintiff also asserts that the ALJ erred at Step Three of the sequential analysis as she failed to articulate why she determined that Plaintiff does not have an impairment or combination of impairments that meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App.1. ECF Dkt. #13 at 14-16. She further contends that the ALJ failed to properly evaluate her credibility and presented and relied upon an inaccurate hypothetical individual to the VE. *Id.* at 21-24.

In light of the undersigned's recommendation that the Court remand the instant case because the ALJ failed to address Plaintiff's fibromyalgia and violated the treating physician rule, the undersigned further recommends that the Court decline to address these remaining allegations as the ALJ's reevaluation and analysis on remand may impact her findings as to these issues in the remaining steps of the sequential evaluation. *See Reynolds*, 424 Fed. App'x at 417.

### VII. CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Court REVESE the ALJ's

decision and REMAND Plaintiff's case to the ALJ for evaluation and analysis of Plaintiff's

fibromyalgia and the March 26, 2013 opinion of Dr. Lohmeyer.


Dated: July 10, 2015                                 */s/ George J. Limbert*
                                                     GEORGE J. LIMBERT
                                                     UNITED STATES MAGISTRATE JUDGE


        ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of
Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to
file objections within the specified time WAIVES the right to appeal the Magistrate Judge's
recommendation. L.R. 72.3(b).